LEXSEE 2002 U.S. DIST. LEXIS 13991

**MINNESOTA SPECIALTY CROPS, INC., Plaintiff, v. MINNESOTA WILD HOCKEY CLUB, LP and NHL ENTERPRISES, LP, Defendants.**

Civil No. 00-2317 (JRT/FLN)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA

*2002 U.S. Dist. LEXIS 13991*

**July 26, 2002, Decided**

**DISPOSITION:** [*1] Defendants' motion to preclude expert testimony denied; defendants' motion for summary judgment denied in part and granted in part; plaintiff's motion for summary judgement denied in part and granted in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In plaintiff specialty food manufacturer's trademark infringement action against defendant professional hockey team, the hockey team moved to exclude the testimony of the manufacturer's expert, and both parties moved for summary judgment.

**OVERVIEW:** The manufacturer of specialty food items sued a professional hockey team for trademark infringement after the hockey team began using the same wording and a similar logo as the manufacturer used. The court denied the hockey team's motion to exclude the manufacturer's expert's testimony regarding his survey of consumer confusion because questions of the expert's credibility were for the jury to decide. The court denied the hockey team summary judgment on the infringement claims because the manufacturer presented direct evidence of consumer confusion through the expert's survey. However, the court granted the hockey team summary judgment on the manufacturer's claim for profits and jury demand because there was no evidence that the hockey team intended to mislead consumers into believing that its products originated with the manufacturer and because all of the manufacturer's remaining claims were equitable. The court granted the manufacturer summary judgment on all of the hockey team's affirmative defenses. Because there was a genuine issue of material fact whether the manufacturer had protectable trademark rights, it denied the manufacturer summary judgment on that issue.

**OUTCOME:** The hockey team's motion to exclude the manufacturer's expert's testimony was denied. The hockey team's motion for summary judgment was granted as to the manufacturer's claim for profits and its jury demand; its motion was denied as to the trademark infringement issues. The manufacturer's motion for summary judgment was denied as to the issue of its trademark rights but was granted as to the hockey team's affirmative defenses.

**LexisNexis(R) Headnotes**

*Trademark Law > Likelihood of Confusion > Consumer Confusion > Surveys*
[HN1] In the Eighth Circuit, consumer confusion surveys are not generally excluded due to flaws in the survey. Rather, technical flaws in consumer confusion studies should bear on the weight accorded them, not on their admissibility.

*Trademark Law > Likelihood of Confusion > Consumer Confusion > Surveys*
[HN2] The proper approach is to view survey evidence with some understanding of the difficulty of devising and running a survey and to use any technical defects only to lessen evidentiary weight, not to reject the results out-of-hand.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN3] *Fed. R. Civ. P. 56(c)* provides that summary judgment shall be rendered forthwith if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
[HN4] On a motion for summary judgment, the moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial.

*Trademark Law > Infringement Actions > Burdens of Proof*
*Trademark Law > Infringement Actions > Determinations*
[HN5] To succeed on its claims of trademark infringement under the Lanham Act, the plaintiff must show that it had a protected common law trademark and that defendants' use of the mark is likely to confuse consumers as to the source of the plaintiff's products.

*Trademark Law > Subject Matter > Distinctiveness > General Overview*
*Trademark Law > Subject Matter > Secondary Meaning > General Overview*
*Trademark Law > Subject Matter > Descriptive & Laudatory Terms > General Overview*
[HN6] The Lanham Act protects only distinctive marks. To determine whether a mark is distinctive, courts generally place the mark in one of four categories: generic, descriptive, suggestive, or arbitrary. Marks which are merely descriptive of a product are not inherently distinctive. When used to describe a product, they do not inherently identify a particular source, and hence cannot be protected. However, descriptive marks may acquire the distinctiveness which will allow them to be protected under the Lanham Act. This acquired distinctiveness is generally called "secondary meaning."

*Trademark Law > Subject Matter > Distinctiveness > Inherent Distinctiveness*
*Trademark Law > Federal Unfair Competition Law > General Overview*
[HN7] Submission of material under § 2(f) of the Lanham Act "amounts to a concession" that the mark is not inherently distinctive.

*Trademark Law > Protection of Rights > Registration > Disclaimer of Unregistrable Matter*
*Trademark Law > Subject Matter > Distinctiveness > General Overview*
[HN8] It is inappropriate to give the presence or absence of a disclaimer on a trademark any legal significance.

*Trademark Law > Subject Matter > Secondary Meaning > General Overview*
*Trademark Law > Protection of Rights > Registration > Evidence*
*Patent Law > Infringement Actions > Defenses > Patent Invalidity > Validity Presumption*
[HN9] Registration of a mark with the U.S. Patent and Trademark Office (PTO) creates a rebuttable presumption that the mark is valid and has secondary meaning. In cases where the PTO did not accept the mark as inherently distinctive, but accepted proof of acquired secondary meaning under § 2(f) of the Lanham Act, the timing of the effectiveness of that presumption is crucial. In such cases, the presumption operates only after the registrations become effective.

*Trademark Law > Subject Matter > Secondary Meaning > General Overview*
[HN10] The user must show that secondary meaning existed prior to the date on which the defendant commenced using the same or similar mark.

*Trademark Law > Subject Matter > Secondary Meaning > General Overview*
[HN11] To establish secondary meaning, the plaintiff must show that through long and exclusive use and advertising in the sale of the user's goods, the mark has become so associated in the public mind with such goods that it serves to identify the source of the goods and to distinguish them from the goods of others. The primary inquiry in determining whether a mark has attained secondary meaning is whether the mark has become associated with a particular source in the consumer's mind.

*Trademark Law > Likelihood of Confusion > Consumer Confusion > Surveys*
*Trademark Law > Conveyances > General Overview*

*Trademark Law > Subject Matter > Secondary Meaning > General Overview*
[HN12] As evidence that a mark has acquired secondary meaning, courts will accept direct evidence of customer confusion, or because direct evidence may be difficult to find, evidence from consumer surveys showing likelihood of confusion. Other factors that may be considered include advertising, amount of sales, established place in the market, and proof of intentional copying.

*Trademark Law > Subject Matter > Secondary Meaning > General Overview*
[HN13] Although advertising is a relevant factor in determining whether a mark has acquired a secondary meaning, it is the effect of such advertising that is important, not its extent.

*Trademark Law > Subject Matter > Secondary Meaning > General Overview*
[HN14] More is needed to establish secondary meaning than merely the self-serving testimony of the plaintiff that some of his customers were confused.

*Trademark Law > Subject Matter > Secondary Meaning > General Overview*
[HN15] Copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's. The relevant intent is not just the intent to copy, but to "pass off" one's goods as those of another.

*Trademark Law > Likelihood of Confusion > Consumer Confusion > Surveys*
*Trademark Law > Subject Matter > Secondary Meaning > General Overview*
[HN16] Even though a consumer survey focuses on confusion, a district court should also examine whether the survey evidence contributes to a showing of secondary meaning.

*Trademark Law > Infringement Actions > Summary Judgment > Standard*
*Trademark Law > Likelihood of Confusion > Consumer Confusion > Surveys*
*Trademark Law > Subject Matter > Secondary Meaning > General Overview*
[HN17] If there is some customer confusion in fact, then it follows that there must also be some secondary meaning.

*Trademark Law > Likelihood of Confusion > Similarity > Appearance, Meaning & Sound > General Overview*
*Trademark Law > Likelihood of Confusion > Intent > General Overview*

*Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview*
[HN18] The court considers six factors to determine whether the plaintiff has demonstrated likelihood of confusion: (1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and that of defendants; (3) the degree of competition between the products; (4) the defendants' intent to "pass off" their goods as the plaintiff's; (5) incidents of actual confusion; and (6) overlap in the channels of commerce.

*Trademark Law > Subject Matter > Secondary Meaning > General Overview*
*Trademark Law > Subject Matter > Strength*
[HN19] To determine the strength of the plaintiff's mark, the court must classify it as either generic, descriptive, suggestive, or arbitrary.

*Trademark Law > Likelihood of Confusion > Similarity > Appearance, Meaning & Sound > General Overview*
[HN20] Rather than consider the similarities between the component parts of the marks, however, the court must evaluate the impression that each mark in its entirety is likely to have to a purchaser exercising the attention usually given by purchasers of such products.

*Trademark Law > Trademark Counterfeiting Act > General Overview*
[HN21] The United States District Court for the District of Minnesota applies the traditional standard and examines whether defendants intended to mislead consumers about the origin of its products.

*Trademark Law > Likelihood of Confusion > Consumer Confusion > Surveys*
[HN22] Although courts must consider all the relevant factors when determining likelihood of confusion, evidence of actual confusion is "positive proof" of such likelihood.

*Trademark Law > Infringement Actions > Remedies > Equitable Relief > Accountings*
*Trademark Law > Infringement Actions > Remedies > Damages > General Overview*
[HN23] An accounting of profits is available in an trademark infringement case only if the plaintiff proves willful, deliberate infringement or deception.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*
*Trademark Law > Infringement Actions > Defenses > General Overview*
[HN24] Waiver requires evidence of a voluntary and intentional relinquishment or abandonment of a known right.

CASE 0:03-cv-02651-JRT-FLN   Document 42-11   Filed 05/04/05   Page 4 of 13

Page 4
2002 U.S. Dist. LEXIS 13991, *

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*
*Trademark Law > Infringement Actions > Defenses > General Overview*
[HN25] The defense of acquiescence requires proof of three elements: (1) that the plaintiff actively represented that it would not assert a right or a claim; (2) that the delay between the plaintiff's active representation and assertion of its right or claim was not excusable; and (3) that the delay caused defendant undue prejudice.

*Trademark Law > Infringement Actions > Defenses > Laches*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*
*Trademark Law > Infringement Actions > Burdens of Proof*
[HN26] The defenses of estoppel and laches are interrelated and require only passive consent to use of an allegedly infringing mark. To prevail on their estoppel defense, defendants must show that: (1) they were misled by the plaintiff's conduct to believe that the plaintiff did not intend to enforce its trademark; (2) they relied on that conduct; and (3) they will be materially prejudiced if the plaintiff is permitted to enforce its trademark rights.

*Trademark Law > Infringement Actions > Defenses > Laches*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*
[HN27] To prevail on a laches defense, defendants must demonstrate that: (1) the plaintiff inexcusably delayed in asserting its trademark claim; and (2) defendants suffered undue prejudice because of that delay.

**COUNSEL:** For plaintiff: Peter M. Lancaster, Gregory M. Krakau, DORSEY & WHITNEY LLP, Minneapolis, MN.

For defendants: Lorin J. Reisner, Christopher J. Klatell, DEBEVOISE & PLIMPTON, New York, New York.

For defendants: Frederick W. Morris, Timothy P. Griffin, LEONARD, STREET AND DEINARD, PA, Minneapolis, MN.

**JUDGES:** JOHN R. TUNHEIM, United States District Judge.

**OPINIONBY:** JOHN R. TUNHEIM

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

Plaintiff Minnesota Specialty Crops ("MSC") has sued defendants, the Minnesota Wild Hockey Club and NHL Enterprises, for infringement of MSC's rights in the trademark MINNESOTA WILD. Specifically, MSC is suing for the following: trademark infringement under § 32 of the Lanham Act, *15 U.S.C. § 1114*(1); unfair competition and common law trademark infringement under § 43(a) of the Lanham Act, *15 U.S.C. § 1125*(a); infringement of common law [*2] trademark rights; violation of the Minnesota Uniform Deceptive Trade Practices Act, *Minn. Stat. § 325D.44*; and common law unfair competition.

MSC seeks: (1) an injunction preventing defendants from using MINNESOTA WILD on any food or beverages or with respect to sales within grocery stores, liquor stores, or food/beverage trade shows that would cause confusion with MSC's mark; (2) an injunction preventing defendants from using MINNESOTA WILD in a way that would cause confusion in MSC's "market area;" (3) a declaration that MSC possesses prior common law trademark rights in MINNESOTA WILD for food, beverages, clothing, and retail stores within its market territories; and (4) an accounting and payment of defendants' profits attained as a result of the alleged infringement. The Hockey Club counterclaimed, seeking declaratory judgment that it has the right to use MINNESOTA WILD in connection with its goods and services.

This matter is now before the Court on three motions: (1) defendants' motion to exclude testimony by MSC's expert, Dr. Ivan Ross; (2) defendants' motion for summary judgment; and (3) MSC's motion for partial summary judgment to establish its trademark rights and to dismiss [*3] certain of defendants' affirmative defenses. For the reasons discussed below, the Court denies defendants' motion to exclude plaintiff's expert, grants defendants' motion for summary judgment in part and denies it in part, and grants plaintiff's motion for partial summary judgment in part and denies it in part.

**BACKGROUND**

Plaintiff MSC is a corporation based in McGregor, Minnesota. Since 1990, MSC has produced a variety of specialty food products that incorporate native and "wild" Minnesota plants and berries, including jams, jellies, and wines. MSC also sells clothing and other novelty items bearing its MINNESOTA WILD mark and logo. These products are sold through the company's catalog, its retail store in McGregor, gift shops, liquor stores, and grocery stores. In 2000, MSC's total sales of food and wine products was $ 559,992.69, and its total sales of "miscellaneous taxable" items (key chains, stickers, etc.) was $ 31,364.99. MSC does not have total figures for its sales of clothing. MSC's MINNESOTA

WILD mark consists of the words "Minnesota Wild" in block capital letters, along with its "tall trees" logo, featuring a picture of pine trees.

Defendant Minnesota Wild Hockey [*4] Club ("Hockey Club" or "Club") is a professional hockey franchise based in St. Paul, Minnesota, and is a member of the National Hockey League ("NHL"). Defendant NHL Enterprises is responsible for the licensing and protection of marks and logos belonging to the NHL and its member clubs. In order to promote itself, the Hockey Club sells a range of merchandise bearing the team's mark. The Hockey Club has used two marks that incorporate the words "Minnesota Wild:" the outline of an animal head, with an inset of a sun, sunset, stream, and trees, and a logo featuring the word "Minnesota" in symmetrical capital letters, next to the word "wild" in stylized script.

In August 1997, the Hockey Club's management was in the process of selecting a name for the team, and determined that "Minnesota Wild" was its leading choice. The Club ordered a trademark search in various categories of products traditionally associated with NHL teams. The search report, which examined records from the U.S. Patent and Trademark Office ("PTO"), common law databases, and other on-line sources, did not find any reference to MSC or its use of MINNESOTA WILD. In November 1997, WHC publicized six potential names for the [*5] team, including "Minnesota Wild."

The Hockey Club claims it learned in late 1997 that MSC was using the mark MINNESOTA WILD for its products. The Club states it then consulted trademark counsel, who assured the Club's management that MSC's use of MINNESOTA WILD would not cause a likelihood of confusion, and that the Hockey Club's use of the name would be lawful.

On January 28, 1998, the Hockey Club publicly announced that the team's name would be the "Minnesota Wild." The same day, MSC sent a letter to the Club, objecting to its use of MINNESOTA WILD and claiming infringement of MSC's trademarks. The Hockey Club claims that upon receiving this objection, it consulted again with attorneys, who assured management that the Hockey Club's name was legal and proper.

Beginning in January 1998, MSC applied for several federal trademark registrations from the PTO. Over the course of 2000 and 2001, MSC received federal trademark registrations for its word and "tall trees" marks for wine, jellies, syrups, honey, and pancake mixes. MSC also received federal registration of the "tall trees" mark for a variety of gift items. The Hockey Club opposed MSC's applications for registration of its word [*6] mark for these gift items, and the opposition proceedings have been suspended pending the outcome of this lawsuit.

## ANALYSIS

### Defendants' Motion to Exclude Expert Testimony

Defendants oppose admitting the testimony and survey of Dr. Ivan Ross, claiming that the survey is seriously flawed, would not be helpful to the trier of fact, and would violate the spirit of *Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*. n1 Defendants point to many alleged flaws in the study, arguing that the composition of the sample, the tone and content of the questions, and the method of tabulation all favor MSC. Defendants cite numerous cases in which courts have excluded surveys due to errors similar to those that allegedly plague Dr. Ross's report, but they cite no Eighth Circuit law in support of excluding the survey. (*See* Def. Mem. Supporting Motion to Preclude Expert Testimony at 2.)

- - - - - - - - - - - - - - - - - -

n1 In *Daubert*, the Supreme Court held that determining the admissibility of expert scientific testimony "entails an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 592-93, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*.

[*7]

[HN1] In the Eighth Circuit, consumer confusion surveys are not generally excluded due to flaws in the survey. *See Insty* Bit, Inc. v. Poly-Tech Indus., Inc., 95 F.3d 663, 671 (8th Cir. 1996)*. Rather, technical flaws in consumer confusion studies should bear on the weight accorded them, not on their admissibility. *Id.*; *Conagra, Inc. v. George A. Hormel & Co., 990 F.2d 368, 370 (8th Cir. 1993)* (affirming district court's decision to give a consumer survey less evidentiary weight due to its technical flaws); *SquirtCo v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980)*. See also *Mutual of Omaha Ins. Co. v. Novak, 836 F.2d 397, 400-01 (8th Cir. 1988)* (holding that a properly conducted survey should be given substantial weight).

Defendants make several allegations about Dr. Ross's survey, which, if true, would seriously undermine his credibility. MSC likewise offers explanations which, if true, would demonstrate that some deficiencies are inevitable, while other alleged deficiencies are in fact strengths. The relative merits of each argument can be borne out on cross-examination, with credibility determinations and weighing [*8] of the evidence left to the trier of fact. *See generally* J. Thomas McCarthy, 5 *McCarthy on Trademarks* § 32:178 (4th ed.)("The

[HN2] proper approach is to view [survey] evidence with some understanding of the difficulty of devising and running a survey and to use any technical defects only to lessen evidentiary weight, not to reject the results out-of-hand.") Therefore, the Court will deny defendants' motion to exclude Dr. Ross's testimony.

**Motions for Summary Judgment**

**I. Standard of Review**

[HN3] *Rule 56(c) of the Federal Rules of Civil Procedure* provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56*. Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. Summary judgment is not appropriate [*9] if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.*

[HN4] The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co., 612 F.2d 1076, 1077 (8th Cir. 1980)*. However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Burst v. Adolph Coors Co., 650 F.2d 930, 932 (8th Cir. 1981)*.

**II. Defendants' Motion for Summary Judgment**

[HN5] To succeed on its claims [*10] of trademark infringement under the Lanham Act, n2 MSC must show that it had a protected common law trademark in MINNESOTA WILD, and that defendants' use of the mark is likely to confuse consumers as to the source of MSC's products. *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999); Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc., 780 F.2d 1324, 1330 (8th Cir. 1985)*. Defendants argue that MSC cannot demonstrate its rights to MINNESOTA WILD because it cannot prove secondary meaning, and that MSC cannot demonstrate a likelihood of confusion. MSC argues that its MINNESOTA WILD mark is inherently distinctive, and alternatively that it need not show any additional proof of secondary meaning, because its mark is federally registered. MSC further argues that even if it cannot rely on a presumption of secondary meaning, the mark has acquired secondary meaning through years of use. MSC also contends that there is a significant likelihood of confusion between its MINNESOTA WILD mark and that of defendants.

> n2 The parties make no distinction between the Lanham Act and the Minnesota Uniform Deceptive Trade Practices Act in their supporting memoranda, and address MSC's claims together under the Lanham Act and the judicial opinions interpreting it. The Court accordingly addresses both motions under the Lanham Act.

[*11]

**A. Secondary Meaning**

**1. Inherent Distinctiveness and Presumptions**

[HN6] The Lanham Act protects only distinctive marks. *Co-Rect Prod., 780 F.2d at 1329*. To determine whether a mark is distinctive, courts generally place the mark in one of four categories: generic, descriptive, suggestive, or arbitrary. *Id.*

> "Marks which are merely descriptive of a product are not inherently distinctive. When used to describe a product, they do not inherently identify a particular source, and hence cannot be protected. However, descriptive marks may acquire the distinctiveness which will allow them to be protected under the [Lanham] Act. . . . This acquired distinctiveness is generally called "secondary meaning."

*Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769, 120 L. Ed. 2d 615, 112 S. Ct. 2753 (1992)*. The Court must first address whether MSC's MINNESOTA WILD mark is inherently distinctive, or whether it can be presumed to have secondary meaning. If either of these is true, MSC need not produce any additional evidence of secondary meaning for purposes of summary judgment.

MSC applied for its first federal trademark registrations [*12] in January 1998. The PTO initially rejected these registrations in June 1998 because "Minnesota" described the geographical origins of MSC's products, and "wild" described the characteristics of MSC's wild rice products. (*See* Second Palsrud Dec. Ex. D.) MSC responded by amending its application and offering proof under § 2(f) of the Lanham Act that the word "Minnesota" had acquired secondary meaning. n3 MSC also requested that rice be removed from the products covered by the mark. (Second Palsrud Dec. Ex. G.) The PTO's examining attorney apparently approved these amendments, and the mark was eventually registered.

n3 Section 2(f) of the Lanham Act provides in relevant part:

> The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made.

*15 U.S.C. § 1052*(f)

[*13]

MSC first contends that its mark is inherently distinctive, because the PTO accepted its registration for MINNESOTA WILD without proof of secondary meaning. In support, MSC notes that the PTO did not require proof of secondary meaning for the word "wild," and required proof of secondary meaning only for "Minnesota." The Court rejects this reasoning, and finds no evidence to support MSC's claim. The record demonstrates that the PTO agreed to register MINNESOTA WILD only after seeing proof under § 2(f) that the word "Minnesota" had acquired secondary meaning. Clearly, the **complete mark** could not have been registered without the component "Minnesota." The Court finds implausible MSC's argument that because one portion of the mark caused no problems, the entire mark is inherently distinctive. Indeed, [HN7] submission of material under § 2(f) "amounts to a concession" that the mark is not inherently distinctive. *Aromatique, Inc. v. Gold Seal, 28 F.3d 863, 869 (8th Cir. 1994); McCarthy on Trademarks and Unfair Competition* § 15:68.

MSC seems to argue that because the PTO reversed its initial decision to require a disclaimer for "wild," the entire mark must be inherently [*14] distinctive. This conclusion is also incorrect. [HN8] It is "inappropriate to give the presence or absence of a disclaimer [on a trademark] any legal significance." *In re National Data Corp., 753 F.2d 1056, 1059 (Fed. Cir. 1985)* (noting that PTO's power to require disclaimers is discretionary and its practice in this regard has been inconsistent). Indeed, "the absence of a disclaimer does not . . . mean that a word or phrase in a registration is, or has become, distinctive in the registered mark. . . ." *Id.* Thus, MSC may not rely on its PTO registration even to show that the word "wild" is inherently distinctive, much less the entire MINNESOTA WILD mark. The Court finds no evidence to support MSC's argument that the PTO accepted its mark as inherently distinctive.

MSC next argues that because its MINNESOTA WILD mark is federally registered, it may rely on a presumption that the mark has acquired secondary meaning. Defendants argue that MINNESOTA WILD is descriptive, evoking the geographical origin and characteristics of MSC's products, and therefore MSC must present evidence of secondary meaning.

[HN9] Registration of a mark with the PTO creates a rebuttable presumption [*15] that the mark is valid and has secondary meaning. *Aromatique, 28 F.3d at 869; 15 U.S.C. § 1115*(a). In cases where the PTO did not accept the mark as inherently distinctive, but accepted proof of acquired secondary meaning under § 2(f), "the timing of the effectiveness of that presumption is crucial." *Aromatique, 28 F.3d at 870*. In such cases, the presumption operates only after the registrations become effective. *Id.* Here, as in *Aromatique*, the PTO's examining attorney rejected MSC's mark as descriptive, and MSC obtained registration by presenting evidence of secondary meaning pursuant to § 2(f). n4 It appears that the earliest date on which an MSC patent became effective was March 7, 2000. (*See* Krakau Dec. in Support of Pl. Motion Ex. D.) It is undisputed that the Hockey Club announced its name to be the "Minnesota Wild" several months earlier, on January 22, 1998. Accordingly, MSC's mark is presumed to acquire secondary meaning only as of March 7, 2000. *Id.* Defendants' use of MINNESOTA WILD prior to MSC's registration is therefore sufficient to prevent MSC from entitlement to any presumption of secondary [*16] meaning. *Co-Rect Prod., 780 F.2d at 1330* [HN10] ("The user must . . . show that secondary meaning existed prior to the date on which the defendant commenced using the same or similar mark.").

n4 As discussed above, the Court finds it of no import that the PTO required proof of secondary meaning for "Minnesota," but not for "wild." It is clear that without some proof of secondary meaning, MSC would not have received its registration for MINNESOTA WILD.

The Court therefore determines that MSC may rely on no presumptions of secondary meaning for purposes of these motions. Accordingly, MSC must present evidence of secondary meaning.

### 2. Evidence of Secondary Meaning

[HN11] To establish secondary meaning, MSC must show that through "long and exclusive use and advertising in the sale of the user's goods, the mark has become so associated in the public mind with such goods that it serves to identify the source of the goods and to distinguish them from the goods of others." *First Bank v. First Bank System, Inc.*, 84 F.3d 1040, 1045 (8th Cir. 1996); [*17] *Co-Rect Prod.*, 780 F.2d at 1330. "The primary inquiry in determining whether [a] mark has attained secondary meaning is whether the mark has become associated with a particular source in the consumer's mind." *First Bank*, 84 F.3d at 1045; *Co-Rect Prod.*, 780 F.2d at 1332-33.

Defendants argue that MSC's MINNESOTA WILD mark has not attained secondary meaning because it has not become associated with MSC in consumers' minds. Defendants claim that MSC has produced no direct evidence that consumers have ever identified MINNESOTA WILD with MSC. MSC argues that its mark has acquired secondary meaning through years of use. MSC also contends that in a "reverse confusion" case such as this, n5 the evidentiary burden upon a smaller, senior user to establish secondary meaning is somewhat lower than in normal cases. *See Commerce Nat'l Ins. Serv., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 444 (3d Cir. 2000).

n5 "Reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." *Mars Musical Adventures, Inc. v. Mars, Inc.*, 159 F. Supp. 2d 1146, 1149 (D. Minn. 2001) (quoting *Rainforest Cafe, Inc. v. Amazon, Inc.*, 86 F. Supp. 2d 886, 897 (D. Minn. 1999) (quotation marks omitted)). See also *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 474 (3d Cir. 1994).

[*18]

As an initial matter, the Court rejects MSC's contention that the evidentiary burden is reduced in a reverse confusion case. It is unclear, first of all, whether the Eighth Circuit has adopted the doctrine of reverse confusion, as only one Court of Appeals case even mentions the doctrine (albeit approvingly). *See Minnesota Pet Breeders, Inc. v. Schell & Kampeter, Inc.*, 41 F.3d 1242, 1246 (8th Cir. 1994). Second, even if this Court determines that the Eighth Circuit has adopted the reverse confusion doctrine generally, no district court or appeals panel in the Eighth Circuit has discussed the doctrine as it pertains to secondary meaning. n6 Therefore, the Court concludes that MSC must meet the traditional standard of proof for secondary meaning.

n6 Only five other courts have discussed the reverse confusion doctrine. *See Mars Musical Adventures*, 159 F. Supp. 2d at 1149-50; *Rainforest Cafe*, 86 F. Supp. 2d at 897-98; *Dream Team Collectibles, Inc. v. NBA Properties, Inc.*, 958 F. Supp. 1401, 1408 (E.D. Mo. 1997); *Minnesota Pet Breeders, Inc. v. Schell & Kampeter, Inc.*, 843 F. Supp. 506, 512 n.5 (D. Minn. 1993); *Scott v. Mego Int'l, Inc.*, 519 F. Supp. 1118, 1136 n.21 (D. Minn. 1981).

[*19]

[HN12] "As evidence that a mark has acquired secondary meaning, courts will accept direct evidence of customer confusion, or because direct evidence may be difficult to find, evidence from consumer surveys showing likelihood of confusion." *Cellular Sales, Inc. v. MacKay*, 942 F.2d 483, 486 (8th Cir. 1991). Other factors that may be considered include advertising, amount of sales, established place in the market, and proof of intentional copying. *Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir. 1995); McCarthy on Trademarks § 15:30.

MSC presents no direct evidence that consumers identify MINNESOTA WILD with MSC. It does present evidence, in the form of affidavits from its owner Jay Erckenbrack, that MSC used the mark for eight years throughout Minnesota before the Hockey Club arrived, that MSC has spent more than $ 180,000 promoting its mark, and that MSC's brand has received media attention in Minnesota. [HN13] Although advertising is a "relevant factor in determining whether a mark has acquired a secondary meaning, it is the **effect** of such advertising that is important, not its extent." *Co-Rect Prod.*, 780 F.2d at 1332 [*20] (emphasis original). Although MSC has devoted much discussion to its media attention and advertising, it has produced no evidence

that this advertising has led consumers to identify MINNESOTA WILD with MSC. MSC has presented sales figures, but these do not demonstrate that consumers identify MINNESOTA WILD with MSC. MSC has also presented evidence of its established place in the market. This evidence, however, comes from the declarations of MSC's owner, Mr. Erckenbrack, or from other MSC employees. This type of testimony is not sufficient to establish secondary meaning. *See id. at 1333* [HN14] ("More is needed to establish [secondary meaning] than merely the self-serving testimony of the plaintiff that some of his customers were confused."). MSC also presents no evidence that the Hockey Club intentionally copied its mark. Although MSC does allege that the Hockey Club knew of its mark when it announced the team name, MSC offers no proof that the team attempted to pass off its products as those of MSC. *See Thomas & Betts Corp. v. Panduit Corp., 65 F.3d 654, 663 (7th Cir. 1995)* [HN15] ("Copying is only evidence of secondary meaning if the defendant's intent in copying [*21] is to confuse consumers and pass off his product as the plaintiff's."); *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC, 259 F.3d 25, 45 (1st Cir. 2001)* ("The relevant intent is not just the intent to copy, but to 'pass off' one's goods as those of another.")

Finally, MSC presents as evidence the consumer survey conducted by Dr. Ross. Although this survey is directed at likelihood of confusion, not secondary meaning, the Court may consider the results that present evidence of secondary meaning. *See Stuart Hall, 51 F.3d at 789* (holding that [HN16] even though a consumer survey focuses on confusion, a district court "should also examine whether the survey evidence contributes to a showing of secondary meaning"); *Cellular Sales, 942 F.2d at 486* (holding that courts may accept "evidence from consumer surveys showing likelihood of confusion" to show secondary meaning); *Co-Rect Prod., 780 F.2d at 1333* (stating that evidence of confusion can also be evidence of secondary meaning). n7

---

n7 Defendants repeatedly argue that MSC's failure to conduct a "secondary meaning survey" should lead to summary judgment. In the cases that defendants cite, the plaintiffs presented no survey evidence **of any kind**. *See Cellular Sales, Inc. v. MacKay, 942 F.2d 483, 486 (8th cir. 1991)* (finding that "no survey or any other evidence has been shown" to establish secondary meaning); *Jeld-Wen, Inc. v. Dalco Indus., Inc., 1999 U.S. App. LEXIS 29548 *9, 1999 WL 1024002 (8th Cir. Nov. 10, 1999)* (noting that "plaintiff presented no customer surveys or any other evidence from third-party witnesses that customers" associated plaintiff with the mark in question). Here, however, *Cellular Sales* prevents MSC's failure to conduct a survey from being fatal to its case. *See Cellular Sales, 942 F.2d at 486* (holding that courts may accept "evidence from consumer surveys showing likelihood of confusion" as evidence of secondary meaning).

[*22]

As discussed below in Part II.B.5, this survey presents evidence of actual confusion. Although MSC presents little additional evidence of secondary meaning, the survey's evidence of actual confusion creates a sufficient issue of material fact to defeat defendants' motion for summary judgment. *See McCarthy on Trademarks* § 15:11 [HN17] ("If there is some customer confusion in fact, then it follows that there must also be some secondary meaning."). Therefore, for purposes of this motion, the Court concludes that MSC has produced sufficient evidence of secondary meaning.

### B. Likelihood of Confusion

[HN18] The Court considers six factors to determine whether MSC has demonstrated likelihood of confusion: (1) the strength of MSC's mark; (2) the similarity between MSC's mark and that of defendants; (3) the degree of competition between the products; (4) the defendants' intent to "pass off" their goods as MSC's; (5) incidents of actual confusion; and (6) overlap in the channels of commerce. *Luigino's, Inc. v. Stouffer Corp., 170 F.3d 827, 830 (8th Cir. 1999)*.

#### 1. Strength of the Mark

MSC argues that because this is a case of "reverse confusion," the strength analysis [*23] must be modified. Instead of analyzing the strength of its senior mark, MSC argues, the Court should examine the strength of defendants' junior mark to see if it could overwhelm MSC's smaller, senior mark. As discussed above, the Eighth Circuit has not explicitly adopted the doctrine of reverse confusion. Although some district courts have discussed the doctrine, none of them has analyzed strength in the way MSC proposes. These courts have modified the strength analysis, however, analyzing the strength of the senior mark at the time of the alleged infringement (in this case, January 1998, when the Hockey Club announced its name), rather than on the basis of the strength resulting from the allegedly infringing use. *See Mars Musical Adventures, Inc. v. Mars, Inc., 159 F. Supp. 2d 1146, 1150 (D. Minn. 2001); Rainforest Cafe, 86 F. Supp. 2d at 898; Dream Team Collectibles, Inc. v. NBA Properties, Inc., 958 F. Supp. 1401, 1411-12 (E.D. Mo. 1997). See Fisons Horticulture, Inc. v. Vigoro Indus., 30 F.3d 466, 478 (3d Cir. 1994)*.

[HN19] To determine the strength of MSC's mark, the Court must classify it as either generic, descriptive, [*24] suggestive, or arbitrary. *Duluth News-Tribune v. Mesabi Publishing Co., Inc., 84 F.3d 1093, 1096 (8th Cir. 1996).* As discussed above, MSC's mark should be classified as "descriptive," because it was only able to obtain PTO registration by showing proof of secondary meaning under § 2(f) of the Lanham Act. MSC's registrations did not become effective until March 7, 2000 at the earliest. Therefore, at the time of the alleged infringement, January 1998, MSC's mark could only be described as descriptive, and therefore relatively weak.

### 2. Similarity

Next, the Court must examine whether the two MINNESOTA WILD marks are similar. The Court determines that they are not. MSC notes that the marks are similar because they use the exact same wording, and that both logos incorporate trees. [HN20] "Rather than consider the similarities between the component parts of the marks," however, the Court must "evaluate the impression that each mark in its entirety is likely to have to a purchaser exercising the attention usually given by purchasers of such products." *84 F.3d at 1097.* Although the marks do have features in common, the Court finds that the marks are not similar. [*25] Upon evaluating the impression that each mark gives, the Court determines that a customer who usually purchases hockey-related products would not get the impression that MSC's merchandise comes from the Hockey Club, and that a purchaser of wild food products and merchandise would not believe that the hockey-related products come from MSC.

### 3. Degree of Competition

The Court next determines that the products of MSC and plaintiff do not compete with each other in the marketplace. MSC claims that because both parties produce some of the same products, such as T-shirts, stickers, key chains, etc., they do compete with each other. MSC also asserts that the parties compete because MSC produces wine, while the Hockey Club has sponsorships with beer companies. The record makes abundantly clear that MSC's products are sold and associated with gourmet foods and other Minnesota cultural products, while the Hockey Club's products are sold and associated with professional hockey. The Court finds it unreasonable to assert that merely because both parties sell T-shirts, or have associations with alcoholic beverages (i.e., MSC produces plum wine while the Hockey Club has a sponsorship relationship [*26] with Bud Light beer), they must be in competition.

### 4. Intent to "Pass Off"

MSC argues that the standard for "intent to pass off" must also be modified in reverse confusion cases. MSC contends that the Court should find intent to pass off if "despite acting innocently, [the Hockey Club] was careless in not conducting proper research to avoid infringement prior to development of [MSC's] trademark." *Mars Musical Adventures, 159 F. Supp. 2d at 1152.* Several district courts in the Eighth Circuit have adopted this standard, which comes from the Third Circuit's decision in *Fisons Horticulture. See 30 F.3d at 478. See also Mars Musical Adventures, 159 F. Supp. 2d at 1152; Rainforest Cafe, 86 F. Supp. 2d at 900; Dream Team Collectibles, 958 F. Supp. at 1415.* This Court declines to follow the *Fisons* standard, because the Third Circuit essentially abandoned it in *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 232-33 (3d Cir. 2000).* In that case, the Third Circuit noted that "there is no reason to ascribe higher penalties to a lower degree of fault because [*27] a particular case involves reverse, rather than direct, confusion." *Id. at 233.* Accordingly, the court held that it was "reluctant to adopt [the] interpretation" that "mere carelessness, as opposed to deliberate intent to confuse, would weigh in a plaintiff's favor in a reverse confusion case." *Id. at 232.* [HN21] This Court will therefore apply the traditional standard, and examine whether defendants intended to mislead consumers, about the origin of its products. *See Luigino's, 170 F.3d at 831; First Nat'l Bank, In Sioux Falls v. First Nat'l. Bank, South Dakota, 153 F.3d 885, 888 (8th Cir. 1998).* Under this standard, the Court finds that although MSC has presented evidence defendants may have known about MSC's mark, it has not shown that the Hockey Club intended to mislead or confuse customers.

### 5. Actual Confusion

[HN22] Although courts must consider all the relevant factors when determining likelihood of confusion, evidence of actual confusion is "positive proof" of such likelihood. *SquirtCo, 628 F.2d at 1091; Northland Ins. Co. v. Blaylock, 115 F. Supp. 2d 1108, 1121 (D. Minn. 2000).* [*28] MSC has presented evidence of actual confusion in Dr. Ross's survey. *See Mutual of Omaha, 836 F.2d at 400* (holding that survey evidence may serve as evidence of actual confusion). *See also Stuart Hall, 51 F.3d at 790.* As noted above, defendants dispute the accuracy and reliability of this survey. Having already determined that the survey is admissible, the Court notes that the survey's accuracy and the weight it should receive are ultimately issues for the trier of fact to resolve. The Court now determines only that the survey results are sufficient to raise a genuine issue of material fact for the purposes of summary judgment.

### 6. Channels of Commerce

The Court determines that the overlap of the parties' products in the channels of commerce are minimal. The Hockey Club's products are targeted at people seeking hockey and sports merchandise, and are sold primarily at sports-related stores and venues. MSC's products are not targeted at these markets, but are intended to evoke a "country image of home-made products" and "the image of a trip to Grandma's house, where everything comes from just outside the back door." (Amended Compl. P 8.) The Court [*29] concludes that even if the products are occasionally sold in the same stores, the fact that the parties aim for such different markets means that this factor does not appreciably contribute to any likelihood of confusion.

Having thus considered all the relevant factors, the Court concludes that MSC has demonstrated a likelihood of confusion, largely through its survey evidence. Because MSC has also produced evidence of secondary meaning, the Court will deny defendant's motion for summary judgment on the issues of trademark infringement.

### C. Claim for Profits and Jury Demand

Finally, defendants argue that MSC's claim for profits should be dismissed, and its demand for a trial by jury stricken. MSC has not sought monetary damages beyond its claim for defendants' profits. (*See* Amended Compl. at 14-16.) [HN23] An accounting of profits is available in an trademark infringement case only if the plaintiff proves "willful, deliberate infringement or deception." *Minnesota Pet Breeders, 41 F.3d at 1247.* See also Restatement (3d) of Unfair Competition § 37 (1995) (stating that accounting of profits is permitted only if the defendant intended to cause confusion or deception). [*30] As discussed above, the Court finds no evidence that the Hockey Club intended to mislead consumers into believing that its products originated with MSC. On the contrary, the record suggests that the Hockey Club knew of MSC's marks, but believed in good faith that its use would not infringe upon them. *See Restatement (3d) of Unfair Competition § 37*, Comment e (stating that an accounting of profits should be limited to cases with "acts intended to create confusion or to deceive prospective purchasers."). *See also McCarthy on Trademarks* § 30:62. The Court will therefore grant defendant's motion for summary judgment on the claim for profits.

All of MSC's remaining claims are clearly equitable, and the Court therefore also must grant defendant's motion to strike MSC's jury demand. Alternatively, even if MSC were allowed to pursue its claim for accounting of profits, MSC would not be entitled to a trial by jury on its accounting claim. MSC argues that the U.S. Supreme Court's decision in *Dairy Queen, Inc. v. Wood, 369 U.S.* 469, 8 L. Ed. 2d 44, 82 S. Ct. 894 (1965) entitles it to a jury trial. In *Wood*, however, the Court noted that even though the claim was [*31] styled as an "accounting," it must really be construed as a contract action or as a claim for trademark damages. *369 U.S. at 476-77*. The Court concluded that despite the claim's self-imposed title, it was "wholly legal in its nature however the complaint is construed." *Id. at 477*. In the present case, there is no dispute that the claim is purely an equitable claim for profits. Therefore, the Court grants defendants' motion to strike MSC's jury demand.

### III. MSC's Motion for Partial Summary Judgment

MSC seeks partial summary judgment to establish two main points: (1) that it owns valid and protectable trademark rights for MINNESOTA WILD; and (2) that defendants' affirmative defenses are unsupported by evidence and should be dismissed. n8

---

n8 The parties' briefs also raised the issue of a trademark for WYLD. At oral argument it became apparent that the parties have abandoned this issue, and the Court considers it moot.

---

### A. Trademark Rights

The issue of MSC's trademark [*32] rights must be considered in light of the Court's analysis in Part II of this Opinion. In order to obtain summary judgment on the question of its trademark rights, MSC would have to show, beyond any issue of material fact, that its mark was distinctive either inherently or by acquiring secondary meaning. The Court has already determined that MSC's mark is not inherently distinctive, and that MSC cannot rely on any presumptions that its mark has acquired secondary meaning. *See* Part II.A.1. It is true that MSC has raised sufficient evidence to show a material dispute over whether its trademark rights are protectable, *see* Part II.A.2, but this is far from the showing needed to obtain summary judgment. The Court determines that there is a genuine issue of material fact on the question of whether MSC has protectable trademark rights in MINNESOTA WILD, and denies MSC's motion on this point.

### B. Affirmative Defenses

MSC challenges the following affirmative defenses raised by defendants: waiver, acquiescence, estoppel, laches, and unclean hands. [HN24] "Waiver requires evidence of a voluntary and intentional relinquishment or abandonment of a known right. . . ." *Haghighi v. Russian-American Broadcasting Co., 173 F.3d 1086, 1088 (8th Cir. 1999).* [*33] Defendants base their waiver and acquiescence claims upon MSC's suggestions

in the pleadings that it does not object to defendants using MINNESOTA WILD in connection with a Hockey Club. It is clear to the Court that MSC did not intend to relinquish its rights to MINNESOTA WILD in these statements, but that the statements were part of arguments that MSC's attempted in good faith to resolve the dispute. There is no evidence of waiver.

[HN25] The defense of acquiescence requires proof of three elements: (1) that MSC actively represented that it would not assert a right or a claim; (2) that the delay between MSC's active representation and assertion of its right or claim was not excusable; and (3) that the delay caused defendant undue prejudice. *Coach House Restaurant, Inc. v. Coach and Six Restaurants, Inc., 934 F.2d 1551, 1558 (11th Cir. 1991); McCarthy on Trademarks* § 31:41. Again, defendant has produced no evidence that MSC actively represented that it would not assert its claim. Indeed, defendants can hardly argue that MSC made such representations, when the statements that allegedly constitute acquiescence are contained in pleadings of this very lawsuit. Therefore, [*34] like the affirmative defense of waiver, the acquiescence claim is without merit.

[HN26] The defenses of estoppel and laches are interrelated and require only passive consent to use of an allegedly infringing mark. *Id.* To prevail on their estoppel defense, defendants must show that: (1) they were misled by MSC's conduct to believe that MSC did not intend to enforce its trademark; (2) they relied on that conduct; and (3) they will be materially prejudiced if MSC is permitted to enforce its trademark rights. *3 M v. Beautone Specialties Co., Ltd., 82 F. Supp. 2d 997, 1005 (D. Minn. 2000)* (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1041 (Fed. Cir. 1992)* (en banc)). Defendants argue that because the finalist names for the Hockey Club were announced prior to January 22, 1998 -- the date MSC sent its demand letter -- MSC must have known about the potential for infringement, and MSC's delay in enforcing its rights should permit the defense of estoppel. This argument is without merit. Even if MSC knew that the Hockey Club was planning to choose "Minnesota Wild" as its name, MSC's choice to assert its rights on [*35] the day the official name was announced does not prove that defendants relied on MSC's conduct. Indeed, the record demonstrates that the Hockey Club's plans were never affected one way or another by MSC's MINNESOTA WILD mark. The Court finds no evidence that defendants relied upon MSC's action or inaction, and for that reason the affirmative defense of estoppel must fail.

Defendants point to the same factual basis for their laches claim. [HN27] To prevail on this defense, defendants must demonstrate that: (1) MSC inexcusably delayed in asserting its trademark claim; and (2) defendants suffered undue prejudice because of that delay. *Hubbard Feeds, 182 F.3d at 601-02; 3 M, 82 F. Supp. 2d at 1003*. Defendants note that they spent a great deal of time and money to develop the "Minnesota Wild" identity, and they were therefore prejudiced by MSC's decision to wait until the announcement day to proclaim its opposition. The Court cannot conclude that MSC's failure to oppose the Club's use of MINNESOTA WILD before it was certain of the infringement constitutes "inexcusable" delay, especially when MSC asserted its rights **on the same day** the [*36] name was announced. *See, e.g., Hubbard Feeds, 182 F.3d at 602* (finding that laches applied when the plaintiff delayed asserting its rights for nine years). Therefore, the Court finds that MSC's delay is not sufficient to support its defense of laches.

The final affirmative defense at issue is that of "unclean hands," which seems to be intertwined with defendants' allegation that MSC sought its trademark registrations in bad faith. Specifically, defendants argue that MSC misled the PTO and the public, and attempted to capitalize on the Hockey Club's goodwill. The Court finds this allegation to be without merit. Defendants present no specific evidence to support this affirmative defense. Rather, they make a variety of unsubstantiated allegations, attempting to make ordinary proceedings and activities appear sinister. Because the Court finds these, and the other affirmative defenses mentioned above, to be without evidentiary support, MSC's motion for partial summary judgment will be granted on this ground, and the affirmative defenses of waiver, acquiescence, estoppel, laches, and unclean hands will be dismissed.

To summarize, the Court denies defendants' motion for [*37] summary judgment on the trademark infringement claims, but grants the motion on the claim for profits. The Court also grants defendant's motion to strike MSC's jury demand. The Court denies MSC's motion for partial summary judgment on the question of its trademark rights, but grants the motion striking defendants' affirmative defenses.

**ORDER**

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Preclude Expert Testimony of Ivan Ross [Docket No. 50] is **DENIED**.

2. Defendants' Motion for Summary Judgment [Docket No. 57] is **DENIED in part and GRANTED in part**, as set forth in Part II of this Opinion.

3. Plaintiff's Motion for Partial Summary Judgment [Docket No. 106] is **DENIED in part and GRANTED in part**, as set forth in Part III of this Opinion.

DATED: July 26, 2002
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge